IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA         :      CRIMINAL ACTION
                                 :
            v.                   :
                                 :
THOMAS D. CARBO                  :      NO. 05-418-3

MEMORANDUM AND ORDER

McLaughlin, J.                                    August 10, 2007


        Thomas D. Carbo was convicted, after a week-long trial,
of two counts of honest services mail fraud and one count of
conspiracy to commit honest services mail fraud in violation of
18 U.S.C. §§ 371, 1341, and 1346.

        Carbo, a Norristown contractor, had been charged along
with two others, Lawrence Mazzerle, another Norristown
businessman, and Anthony Biondi, the municipal administrator for
the Borough of Norristown.  Carbo and Mazzerle were alleged to
have gone into business with Biondi and paid him money at a time
when Biondi was awarding Carbo and Mazzerle with municipal
contracting work.  Under state law, Biondi, as a municipal
official, had a duty to publicly disclose both his relationship
with Carbo and Mazzerle and their payments to him.  Carbo and
Mazzerle were alleged to have denied the citizens of Norristown
Biondi's honest services when they agreed to help him conceal
both his relationship with them and his payments from them in
violation of these reporting requirements.

Mazzerle and Biondi both pled guilty before trial. Carbo proceeded to trial where he was convicted.  Before Carbo's case was submitted to the jury, at the close of the government's case, Carbo moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure on the ground that the government failed to present sufficient evidence of Carbo's specific intent to commit the crimes charged.  Specifically, Carbo contended that the government presented insufficient evidence that he knew of Biondi's reporting requirement or that he acted with the specific intent to aid Biondi in avoiding it.[1] The Court reserved decision on Carbo's motion and decides it now. For the reasons set out below, the Court will grant a judgment of acquittal.

Carbo also filed separate motions for a new trial pursuant to Rule 33 and to arrest judgment pursuant to Rule 34 of the Federal Rules of Criminal Procedure.  The Court also addresses those motions here and denies them.


I.   Summary of Evidence at Trial

The following is a summary of the testimony of each witness who testified during the government's case-in-chief.  The

---

[1] Carbo also raises a second issue of whether the government presented sufficient evidence that Biondi exercised discretionary decision-making in favor of Carbo.  The Court concludes that the government did present sufficient evidence on this issue.

2

defendant did not put on any evidence.  The Court has not used either the government's or the defendant's description of the evidence.  The Court was concerned that the summary of the evidence presented by both the government and the defendant consisted of the parties' characterization of the evidence and/or their inferences from the evidence, as opposed to a summary of what the witnesses or documents actually said.  The defendant also omitted some of the most incriminating evidence that was presented at trial.  The Court believes that it is important to start with as neutral a recitation of the evidence as possible. The government is entitled to all reasonable inferences from that evidence but we must start with an accurate description of the testimony and documents.  The Court read the transcripts of the trial as well as the relevant documents in preparing this summary.

   A.   <u>Testimony of Monica DeCaro</u>

        Monica DeCaro was the finance director for the Borough of Norristown from September 1995 until February 2000 and from July 2003 to the present.  Anthony Biondi was the Borough Administrator during her time as finance director.  Biondi was in charge of the contracting process.  According to the Borough's administrative code, if the Borough was making a purchase of $10,000 or more, the Borough was required to have a competitive

bid.  If the service to be purchased was under $10,000, Biondi
was authorized to contract for the purchase.  DeCaro knew
Lawrence Mazzerle and Thomas Carbo as people who did work for the
Borough.  They would come in and say hello to her if they
happened to be in the building.  Sometimes they stopped by to
pick up their checks.  Neither Mazzerle nor Carbo told her that
Anthony Biondi was working with them in any capacity.

          The Borough was in poor financial condition in 2003.
In April of 2004, the Borough of Norristown changed its political
system when a new home rule charter was passed.  The charter
eliminated the post of mayor and gave many of the mayor's
responsibilities to the president of the Borough Council.  In
July of 2004, Biondi's employment with the Borough was
terminated.  The Borough Administrator thereafter was selected by
the Borough Council.

          When DeCaro worked for the Borough, the State of
Pennsylvania required certain Borough employees, including DeCaro
and Biondi, to fill out a financial disclosure document annually.
The document required disclosure of all sources of income over a
certain amount, which was $600 for most types of income and a
little higher amount for others.  Before she obtained her job at
the Borough, DeCaro was not aware of the financial disclosure
document.

B.   <u>Testimony of Joseph Picard</u>

Joseph Picard was the director of the Department of Public Works ("Department") from approximately 1993 through 2003. In that position he reported to Biondi.  Biondi served as the Norristown Borough Administrator from approximately 1994 through July 2004.  As Borough Administrator, Biondi oversaw the day to day operations of the Borough.

The Department was responsible for paving and snow plowing work performed on behalf of the Borough.  The Borough used only outside contractors for paving work; snow plowing and salting work was done by both outside contractors and municipal employees.  Biondi had authority to hire outside contractors for both kinds of jobs.

Before 1998, the Borough used a competitive bidding process to award work to outside contractors for jobs worth more than $10,000.  In 1998, the Borough council passed a resolution changing the bidding process for these jobs.  Instead of requiring competitive bidding, the resolution authorized the Borough to select contractors for jobs costing $10,000 or more from a county-wide list of approved contractors.  For jobs that were less than $10,000 or in emergency situations (such as plowing work after snowstorms), the Borough had the discretion and authority to select any contractor to perform work.  Biondi

never recused himself from the selection of Carbo or Mazzerle for Borough work.

Lawrence Mazzerle and his business partner William Moran own a business, Pottstown Contracting Company ("Pottstown Contracting"), that does paving, snow plowing, and other construction work.  Pottstown Contracting was on the county's list of approved contractors.  Pottstown Contracting was selected by Biondi to do jobs for the Borough beginning in 1997 through October of 2003.

Thomas Carbo also owns a business that does paving and plowing, Tommy's Paving and Excavating ("Tommy's Paving").  Tommy's Paving also did jobs for the Borough, although these jobs were generally smaller than those done by Pottstown Contracting, including alley paving, sewer work, repair work, etc.  Tommy's Paving did some paving and snow removal with the Borough as well.  As far as Picard knows, Tommy's Paving was not on the county list of approved contractors.

Outside contractors hired to perform work on behalf of the Borough submitted invoices for payment.  These invoices would be initially reviewed by Picard to ensure their accuracy and appropriateness.  The invoices were then forwarded to the Finance Department, which would ensure that sufficient funds were available to make payment for the work performed.  The invoices then were submitted to Biondi for final approval.

6

The Department has quality control mechanisms in place to make sure that contractors do not charge the Borough for work they have not performed.  The Department has an inspector who visits job sites, and Picard, himself, would also personally go out to paving jobs to make sure work was being done.  Picard never received any information suggesting that Carbo billed the Borough for work he did not perform, so-called "ghost work," but he did receive such information about Mazzerle.  Picard was presented with invoices from Mazzerle that involved unjustified charges for $30,000 to $40,000.  He refused to approve those invoices.  He told Biondi that Mazzerle was over-billing the borough for ghost work.  Biondi brought in Mazzerle and Moran and talked to them.  This occurred in 1997 or 1998.  Biondi continued to give Mazzerle work after that.

From October 2001 through 2003, when Picard left, Biondi selected firms to do paving and snow plowing work in the Borough.  He also approved the invoices for this work.  During this time, Biondi selected Pottstown Contracting for paving and plowing work, and Tommy's Paving was used for minor paving work and snow plowing.  At one point, Carbo's company was a subcontractor for Pottstown Contracting.

Norristown held a mayoral election in 2001 in which the then-current mayor faced a challenger.  Picard had a conversation with Biondi about the election and about the possibility of

Biondi losing his job.  After this conversation, Picard took a trip with Biondi to look at a 1988 Mack truck owned by Kedra Environmental Services ("Kedra Environmental"), a company owned by Jim Jones.

The 2002 Norristown mayoral election was won by the incumbent and Biondi kept his job.  Biondi disclosed to Picard sometime after the election that he owned the 1988 Mack truck. Biondi told Picard he was going to sell it to Pottstown Contracting.  Picard recalls seeing the truck at Pottstown Contracting both before and after the election.  Picard never saw the truck used on Borough jobs, and he did not know whether Biondi used the truck with Pottstown Contracting.

        C.   Testimony of Rochelle Rawlins

        Rawlins was the Assistant Finance Director for the Borough of Norristown beginning in November of 1996.  She reported first to Monica DeCaro and then to Anthony Biondi. Rawlins acted as the interim finance director after DeCaro left. The Borough's procedure for paying vendors is to have a purchase order filled out, then the purchase order is matched with an invoice and a check is cut.  Checks then went to Anthony Biondi for his stamped signature.

        In October of 2001, Rawlins signed paperwork allowing Biondi to get a $25,000 loan from his pension.  One of the

documents signed by Biondi described the purpose of the loan as "Major Purchase – Truck."  Rawlins recalls Biondi telling her the purpose of the loan was to buy a truck.

Biondi never recused himself in the selection of either Carbo or Mazzerle for Borough work.

Rawlins had never heard of a document called a statement of financial interest form before she had to fill out one herself as a Borough worker.


D.   Testimony of Robert Caruso

Robert Caruso is the Deputy Executive Director and Director of Development for the Pennsylvania State Ethics Commission.  As part of his job, he is involved in enforcing the disclosures required by Pennsylvania law and in investigating alleged improprieties.

Public officials in Pennsylvania are governed by the Ethics Act.[2]  Biondi, as a Borough administrator was covered by the Act.  The Act forbids public officials from using their office to benefit themselves or from accepting or soliciting anything of monetary value based on an understanding that the official's actions or judgment would be influenced thereby.  It also forbids anyone from offering a public official anything of

---

[2] The Public Official and Employee Ethics Act, 65 Pa. C.S.A. § 1101 et seq.

monetary value in order to influence the official's actions or judgment.

As part of the Ethics Act, public officials, including Biondi, were required each year to make certain legally-mandated disclosures about his finances, including completing a Statement of Financial Interest ("SFI").  On the SFI, public officials are legally required to disclose their sources of income in excess of $1300 and their ownership in any company.

A public official who intentionally violates his or her disclosure obligations is subject to misdemeanor penalties and a fine of $1,000.  The responsibility to make accurate and complete financial disclosures rests with the public official or employee. Private citizens have no duty of disclosure under the Act.

Biondi omitted the outside income he earned from his truck hauling business from his SFIs for the years 2001, 2002, and 2003.  His SFIs for those years also disclose no interest in any business for profit and no employment in any business.


E.    Testimony of Cheryl Carter

Cheryl Carter was the office manager for Thomas Carbo's company, Tommy's Paving, from early 2003 to December 2003.  She kept the company's financial records and used the computer program "Quickbooks" to do the books.  Carter was also responsible for submitting time for payroll.  Carter would submit

employees' time cards to an outside payroll company which would
then cut the checks and withhold the appropriate taxes.

Someone receiving a paycheck from the company would be
in Quickbooks.  She did not recall the name Anthony Biondi.  She
did not recall his getting a paycheck during the time she worked
there in 2003.  He would be in Quickbooks if he was working
there, unless she was paid in cash.

Carbo's records were a mess.  She organized them and
set up a filing system.  Carbo paid cash to a lot of vendors.
She would know when Carbo made a cash withdrawal because she went
online every morning to check the company's bank account.  When
she did so, she would see any cash withdrawals made the previous
day.  She would usually call Carbo when she would see a cash
withdrawal and ask him if he had made the withdrawal.  If he said
"yes," he would tell her to which one of his people he had given
the cash and that person was supposed to bring back a receipt.
Carter got receipts most but not all the time.  The receipts
usually would not match up to the withdrawals.

Quickbooks allows users to categorize expenditures.
When Carter started, Carbo went over with her what the different
categories were and what expenses belonged in what category.  The
category "job materials" included anything the company used on a
job site, including materials or equipment.  Cash withdrawals

11

were often placed in this category until Carter could figure out where to put them.

When bills came into the office, Carter would cut a check.  Sometimes she would not have a bill and Carbo would tell her that he needed a check for something.  She would then write or print the check.  Sometimes Carbo would write a check himself and then write on a receipt or the check stub the reason for the check.  Carter would then enter this information into the computer.

F.   Testimony of Margaret O'Hara

Margaret O'Hara worked in the office at Carbo's company from 2000 to the present.  She knows Anthony Biondi.  She has seen him at Carbo's shop.  She was not aware that he was doing trucking work for Carbo.  She learned about it when she was making copies of invoices with two slips that had Biondi's name on them.  These were in a file for "Number 1 Contracting."  She did not find any time cards for Biondi or any mention of him in Quickbooks.

G.   Testimony of Special Agent Laura Capra

Special Agent Laura Capra was one of the lead investigators in the case.  She testified about the contents of documents she reviewed.

12

Biondi borrowed $25,000 from his retirement plan in October of 2001.  On October 31, 2001, he deposited that $25,000 check into his personal Progress Bank account.  He then made three successive cash withdrawals:  $5000 in cash on October 31, 2001;  $5000 in cash on November 6, 2001; and $9,223 in cash on November 13, 2001.  On November 9, 2001, Pottstown Contracting wrote a check for $7,500 to Kedra Environmental for the purchase of a 1988 Mack truck.  This is the same company that Joseph Picard testified he visited with Biondi to look at a 1988 Mack truck.  Kedra Environmental's business records for November 9, 2001, show the sale of an asset – a 1988 Mack truck – on that date for $7,500.

On the same day, November 9, 2001, Pottstown Contracting and Kedra Environmental filled out a MV-1 form from the Pennsylvania Department of Transportation ("PennDot").  This form is filled out by the seller and buyer of a vehicle and shows the value of the transaction.  It shows the sale of the 1988 Mack truck from Kedra Environmental to Pottstown Contracting for $7,500.  Because the $7,500 price was less than the fair market value of the truck, an additional form had to be completed explaining the price.  This form, signed by Mazzerle and Kedra Environmental's owner, says the truck sold for $7,500 because of "clutch transmission and rear problems."  On December 11, 2001, Pottstown Contracting registered the Mack dump truck in its name

and received the registration from PennDot.  The truck has Pottstown Contracting printed on the side door.  The documents are signed by Mazzerle for Pottstown Contracting.

On July 9, 2003, Pottstown Contracting signed the title of the 1988 Mack truck over to Tommy's Paving (designated as "TPE Enterprises").  Mazzerle's partner William Moran signed the title for Pottstown Contracting and Carbo signed for Tommy's Paving. Carbo purchased the 1988 Mack truck from Biondi for approximately $20,000.  On July 9, 2003, Carbo purchased a $10,000 bank check made out to Pottstown Contracting.  On the same day, Pottstown Contracting deposited the $10,000 bank check into its business bank account.

Biondi and Mazzerle purchased a second truck, a 1995 Peterbilt, at around the same time that Carbo purchased the 1988 Mack truck.  On June 20, 2003, a deposit ticket signed by Mazzerle shows he put a $1,000 cash deposit on a 1995 Peterbilt truck at Opdike, a truck company.  In July of 2003, Biondi got a $25,000 loan from Progress Bank.  On July 8, 2003, Biondi wrote a $25,000 check to Opdike from his bank account.  On July 9, 2003 (the same day that Pottstown Contracting received the $10,000 bank check from Carbo for the 1988 Mack truck), Pottstown Contracting wrote a check for $10,000 to Opdike from their business bank account toward the purchase of the 1995 Peterbilt truck.  On July 11, 2003, $4,353.50 in cash was paid to Opdike to

14

cover the balance of the truck, the price of which was
$40,353.50.  The last transaction concerning the 1995 Peterbilt
truck for which Agent Capra reviewed documents was a bank check
for $2,412.56, which Carbo purchased on August 28, 2003.  This
check was made payable to a place called "Veccione's" and was for
a paint job on the 1995 Peterbilt truck.

Agent Capra then returned to the subject of the
transactions surrounding Carbo's purchase of the 1988 Mack truck
on July 9, 2003.  A withdrawal ticket dated July 9, 2003, shows
that on that date, Carbo withdrew $10,000 from the First Union
business account of his company.  A notation on the withdrawal
ticket says "Pottstown Contracting."  The bank statement for
Carbo's company, Tommy's Paving, shows two "counter withdrawals"
on July 9, 2003, one for $10,000 and another for $4,500.  The
$10,000 bank check that Carbo purchased on July 9, 2003, is made
payable to Pottstown Contracting and notations on it show it was
endorsed by Pottstown Contracting and deposited into its business
account.  This deposit is confirmed by a deposit slip.  A check
drawing from that Pottstown Contracting account for $10,000,
dated that same day and signed by Mazzerle, was written to
Opdike.  In the memo section of the check, next to the pre-
printed word "for" is the handwritten notation "truck."

Agent Capra also testified about deposit tickets from
Opdike showing its deposits of the money received from Pottstown

15

Contracting for the 1995 Peterbilt truck.  The deposit tickets show a deposit of $1,000 cash in Opdike's account on June 20, 2003, and a $4,353.50 cash deposit on July 11, 2003.  Both deposit slips contain the notation "Potts Dep."  Agent Capra noted that Carbo withdrew $4,500 in cash on July 9, 2003, and on July 11, 2003, Pottstown Contracting paid $4,353.50 in cash for the Peterbilt truck.  She later testified that she had not determined that Carbo's July 9 cash withdrawal had provided the funds for Pottstown Contracting's July 11 payment and that the money could have come from either Carbo's or Pottstown Contracting's bank account.  Neither Pottstown Contracting's nor Biondi's bank records show any cash withdrawal in the amount of $4,353.50 around the time of the July 11, 2003, payment.

Agent Capra testified further about the August 28, 2003, bank check for $2,412.56, purchased by Carbo.  The check was made out to "Vecchione" [sic], a company that does painting and detail work.  A notation on the check refers to Carbo's company, "Tommy's Paving & Excavating."  Agent Capra reviewed Carbo's company's Quickbooks system with Cheryl Carter, the company office manager.  The $2,412.56 paid for the bank check was not recorded in the company's Quickbooks or anywhere else in the company's books.  The name "Veccione" was in the system but there was no amount written and no record of any transaction.

16

There were two records of transactions on July 9, 2003 in Carbo's company's Quickbooks.  The first is for $4,500 and has two notations:  "EFT," which stands for electronic fund transfer, and "job materials."  Special Agent Capra believes this transfer was not, in fact, an electronic fund transfer, but instead records the cash withdrawal that Carbo made on that date.  The second entry for July 9, 2003 is for $10,000 and is notated with the letters "WD," which stands for cash withdrawal, and the phrase "job materials."  Special Agent Capra thinks that is the notation for the $10,000 withdrawal which purchased the bank check which went to Opdike for the 1995 Peterbilt truck.

Agent Capra further testified about the purchase price for the 1988 Mack truck.  Agent Capra testified that she believed the components of Carbo's purchase price for the truck were the July 9, 2003, $10,000 bank check that Carbo purchased in the name of Pottstown Contracting;  the $4,500 cash withdrawal made by Carbo on July 9, 2003;  a $500 deposit that Biondi made to his bank account on July 11, 2003; and the August 28, 2003, bank check for $2,412.56 to Veccione for the painting of the 1995 Peterbilt truck.  These amounts total $17,412.56.  In reaching this conclusion, Agent Capra is assuming that the documented $500 deposit by Biondi on July 11, 2003, came from Carbo and was part of the payment for the 1988 Mack truck.  This is corroborated by workpapers from Carbo's accountant which in a depreciation

schedule show the purchase price of the 1988 Mack truck to be
$17,412, which is (within $0.56) the same as the total of all the
payments she believes made up the purchase price.  A PennDot form
filled out to show Carbo's purchase of the truck, signed by Carbo
and Mazzerle's partner William Moran, shows the purchase price of
the truck to be $8,000.  The separate PennDot form justifying why
the sale price was less than the truck's fair market value says
that it was the "agreed price."

          Agent Capra testified that she examined the Quickbooks
of Carbo's business, Tommy's Paving.  There were no records in
the Quickbooks that showed any payment in any form to Biondi.
There was similarly no record of payments to Biondi in any other
record books for Carbo's business.

          On cross, Agent Capra was asked about invoices and time
records from Tommy's Paving concerning work done for Number 1
Contracting Corp.  These documents show hours of work performed
by "Anthony," whom Agent Capra believed to be Biondi, and
identify the truck he used, the location, the job number, and a
description of the work.  There are nine time cards in total,
showing "Anthony" worked on nine days between June 21, 2003, and
September 27, 2003.

          Agent Capra testified about records she reviewed from
the Borough of Norristown.  From November 2001 through April
2004, the time-period alleged in the indictment, the Borough of

18

Norristown paid Pottstown Contracting $77,885.33, with the first payment in this period made December 31, 2001, and the last April 6, 2004.  For this same period, the Borough of Norristown paid Tommy's Paving & Excavating $33,702.63, with the first payment in this period made January 9, 2002, and the last April 15, 2004.

Agent Capra also testified about payments made to Biondi, memorialized in the government's Exhibit 52.  According to that exhibit, during 2002, Biondi received $9,000 from Pottstown Contracting, and during 2003, Biondi received $2,840 from Pottstown Contracting and $9,536 from Tommy's Paving and Excavating.

H.   <u>Testimony of Special Agent Stephen Gray</u>

Agent Gray is an FBI agent.  He testified concerning Joseph Corropolese's becoming a cooperating witness for the government.  Agent Gray approached Corropolese with evidence that the government had against him and asked for Corropolese's cooperation.  Corropolese decided to cooperate in the investigation in the Borough of Norristown.  He made a number of recordings, both body recordings and telephonic recordings for the government.  He made a tape recording of one conversation with Carbo.  Agent Gray never directed Corropolese to tape Carbo. Corropolese made approximately forty tapes for the government.

Agent Gray reviewed with the jury certain sections of the Home Rule Charter of Norristown.

I.   <u>Testimony of Joseph Corropolese</u>

Mr. Corropolese has been a tow truck operator with a contract with the Borough of Norristown.  He has known Anthony Biondi since Biondi was born.  He was introduced to Lawrence Mazzerle by Biondi in 1996 or 1997.  He knew the mayor of Norristown, Theodore LaBanc.  He had a personal relationship with Biondi and socialized with him frequently.  He socialized with Mazzerle and Moran, but not as often.  He also had, at times, social interaction with Carbo, but not as much as with the other individuals.

The government played a tape of a conversation between Corropolese and Carbo at Hooter's restaurant on November 20, 2003.  During the recorded conversation, Corropolese expressed concern about losing his job with the Borough in April when the Home Rule Charter went into effect.  Carbo said that Biondi did a lot of work for him.  They discussed Carbo's trucking business.  Carbo said that he had a customer that was slow in paying him for trucking.  Carbo said that he charges $57.50 an hour and that comes to $500 a day.  Carbo said that he made the most money with the 1988 Mack truck.  Carbo said that he put a driver in it.

20

Carbo said that he fueled the truck and drove the truck.  Biondi
would get $300 or $400 per day.

Carbo said he owes Biondi $5,000 for work he did about
a month before.  The people he was working for were slow in
paying.  Carbo said that he could write Biondi a check but he has
to get cash.  Carbo said he was chipping away at the $5,000 by
giving Biondi $500 or $1000 at a time, but he has been busy and
has not seen Biondi.

Carbo stated on the tape that he bought the Mack truck
from Biondi.  He said that the best part about the truck was that
he owed Biondi what it was worth.  He owed him $12,000 and Biondi
wanted $20,000 for the truck.  Corropolese said that there was no
one greasing Biondi and Carbo responded "No, he don't want
nothin."

Carbo and Corropolese discussed on the tape how much
money can be made from a truck.  Carbo said the costs of a truck
can run $170 a week in insurance and tags and $150 a week in
fuel, but that you can make about $1000 a week.  Carbo said that
Pottstown Contracting and its owners Mazzerle and Moran "never
haul," but "they're clearly fucking billing and ain't working."
Carbo said he rents his trucks out, unlike his competitors, so
his trucks are running almost every day.

Corropolese asked Carbo why Biondi "hangs with" Moran
and Mazzerle and speculates that "[m]aybe they're taking care of

21

him and nobody knows it."  Carbo said that he and Biondi are friends and that "[h]e wouldn't take . . . if I do a job he won't even let me buy him dinner."

Carbo complained that he was working on alleys "for eight hundred dollars, a thousand dollars, and I was all over there by myself quiet, no one knew what was going on."  Carbo said, Mazzerle and Moran then "get involved" and now "there's a fucking paper trail to hell for that shit."  Carbo said "they all, you know, everyone says auditor came, you know, guess what, something ain't right."  He continued "I love [Biondi] to death and, and, all I know is he never took anything from me and always insisted he didn't want anything."

Carbo complained that he was always given the excuse of not being on the list as to why he was not given work.  Carbo would do work for Mazzerle or someone else who is on the list. Carbo therefore got on the list.  Carbo said that he would bid the list and honor the list.

At one point in the conversation, Carbo said that knew that Biondi's current truck, the 1995 Peterbilt, was titled in the names of Mazzerle and his partner William Moran.  He said he had told Biondi that he should get the truck out of their names before he lost his position as Borough Administrator:  "you better get that truck out of [Moran's] and [Mazzerle's] name

22

before you,... before that Borough's done. . . .  Otherwise,
you'll have to kill [them] to get it."


    J.   <u>Testimony of Lawrence Mazzerle</u>

        Mazzerle owns a contracting company, Pottstown
Contracting, with his business partner, William Moran.  He met
Biondi in 1997 or 1998, and almost immediately struck up a
friendship.  Between the time he first met Biondi and 2001,
Biondi awarded Mazzerle's business up to $375,000 in Borough
paving work.  In 2001, his work with the Borough "dried up" and
he did only $70,000 worth of work that year.

        In late 2001, Mazzerle and Biondi had a conversation
about the upcoming mayoral election in Norristown.  Biondi
expressed concern that if the current mayor lost his bid for
reelection, the new mayor might fire him.  After that
conversation, Biondi told Mazzerle that there was a truck for
sale by Kedra Environmental, a 1988 Mack dump truck.  Biondi told
Mazzerle he wanted to buy the truck and Mazzerle agreed to "go
in" with him.

        The purchase price of the 1988 Mack truck was $20,000.
Mazzerle contributed $7,500 toward the price.  Mazzerle hoped by
contributing to the truck that he would be able to purchase it
from Biondi if Biondi grew bored with it.  Mazzerle did not know
how Biondi was going to pay for the rest of the purchase price of

the truck.  Mazzerle does not know whether Biondi actually paid the remainder of the purchase price for the truck.

Biondi asked Mazzerle to title and insure the 1988 Mack truck in the name of Mazzerle's company, Pottstown Contracting. Mazzerle agreed because he thought he would eventually be owning the truck.  Mazzerle considered the truck to be Biondi's and not his, but he treated their relationship as if they were co-owners. Mazzerle concedes he concealed the fact that Biondi was going to be his business partner with respect to the truck and that Mr. Carbo had nothing to do with this decision.

The paperwork for the transfer of the truck was signed on November 9, 2001.  On that day, Biondi sent the owner of Kedra Environmental, Jim Jones, to Pottstown Contracting.  Biondi and Jones had previously negotiated a $20,000 price for the truck. Mazzerle and Jones then went to a "tag store" to transfer the truck's title to Pottstown Contracting.  Mazzerle brought with him two checks issued from Pottstown Contracting, one for $7,500 toward the purchase price and one for the state tax and tags.

On the PennDot forms relating to the transfer of ownership, Mazzerle falsely listed the purchase price of the 1988 Mack truck as $7,500 and falsely listed the sole owner of the truck as Pottstown Contracting.  On a separate form requiring a justification for a purchase price less than fair market value, Mazzerle justified the $7,500 purchase price by falsely stating

24

that the truck had a bad clutch and transmission.  Mazzerle gave the false $7,500 figure to avoid paying sales tax on the full purchase price.

Biondi and Mazzerle agreed that both of them would be able to use the 1988 Mack truck, both separately and together. If Biondi had a job for the truck; he could use it.  If Pottstown Contracting had a job for the truck; Mazzerle could use it himself or hire Biondi to drive it.  If Biondi drove the truck for Pottstown Contracting, or hired a driver to do so when he was not available, then Pottstown Contracting would pay Biondi.  If Mazzerle or his partner drove the truck themselves, then Biondi would not be paid.  Biondi could also drive the truck for other companies.  Biondi was responsible for all expenses on the truck.

Biondi instructed Mazzerle that he wanted to be paid in cash for the use of the truck because he was not going to report this money on his income tax.  Biondi also instructed Mazzerle that he did not want the truck used in the Borough of Norristown because some people in Norristown knew he owned the truck and he did not want people to believe he was giving Borough work to his own truck.

Much of Mazzerle's use of the 1988 Mack truck was on a job site known as the Montgomery County trail.  This job was awarded by the County and involved several outside contractors who were working to convert a railroad track into an exercise and

bicycle trail.  Mazzerle's records show he used the truck on the trail job for 43 days during the first half of 2001 and an additional seven days in July 2001.  For those days, Mazzerle billed the county $500 a day and paid Biondi $460 a day.  This amounted to Mazzerle's receiving approximately $25,000 from the county, out of which he owed Biondi approximately $23,000, for a profit of $2000.

Mazzerle did not pay Biondi every day.  He would let the amount he owed accumulate and then pay Biondi in periodic lump sums.  Mazzerle paid Biondi two cash payments of $3,000 and two cash payments of $2000 towards the amount he owed for the work on the Montgomery County trail and deducted from the remaining amount approximately $8,700 in expenses Mazzerle paid for repairs and insurance on the truck.

This pattern of Mazzerle owing Biondi $460 a day for the use of the truck, less expenses, and paying the amount due only in cash continued in 2002 and 2003.  During this time, Biondi also drove the 1988 Mack truck for other people, including Carbo.

The truck was housed and kept at Pottstown Contracting in a yard surrounded by a secure fence.  When Carbo wanted to use the truck he would call Biondi and ask if it was available and if Biondi or another driver was free to drive it.  On at least one occasion, when Carbo's own truck was broken, Carbo sent his own

26

driver to use the truck, and Biondi called Mazzerle to ask him to leave the gate open.  At some point in 2002 or 2003, Carbo began using the truck more often.  Three or four months after Biondi purchased the truck, Carbo several times parked the truck at his own business so that he would not have to go to Pottstown Contracting to pick it up.

Mazzerle did not object to Carbo's increasing use of the 1988 Mack truck because he had become concerned about its safety.  The truck had flipped over twice while being used by Mazzerle and Biondi.  Mazzerle expressed concern to Biondi that if the truck flipped over while Carbo was using it, Mazzerle would have a problem because the truck's insurance was in his company's name.  Biondi discussed the issue with Carbo and Carbo offered to buy the truck.  Biondi then told Mazzerle that he had agreed to sell the truck to Carbo, and that he was thinking about buying a new truck, a 1995 Peterbilt that he seen for sale for $42,000.

Mazzerle was happy to have the 1988 Mack truck sold because he thought there was something wrong with it.  Mazzerle told Biondi that he thought Biondi's selling the 1988 Mack truck and buying the 1995 Peterbilt was a good decision because Biondi had bought the first truck for $20,000 and was selling it for the same amount, and for only an another $18,000 he would go from a 1988 truck to a 1995 model.  A few days before they sold the 1988

27

Mack truck to Carbo, Biondi and Mazzerle went to Opdike, the truck dealer selling the 1995 Peterbilt truck, and test drove the 1995 Peterbilt and negotiated a purchase price of $38,000. Biondi told him that he had previously been to Opdike's to look at the same truck with Carbo.

Biondi's price for selling the 1988 Mack truck to Carbo was $20,000. As part of that sale, Carbo gave Mazzerle's company, Pottstown Contracting, a $10,000 bank check. Mazzerle required Carbo to pay by bank check because he was concerned that Carbo was having financial problems and that a regular check might bounce. Mazzerle had been told by Biondi that Carbo had not paid him all the money he was owed for the 1988 Mack truck. Biondi told Mazzerle that Carbo still owed him $5,000 toward the purchase price. This fact also led Mazzerle to require Carbo to pay by bank check.

Carbo gave Mazzerle the $10,000 bank check in person at Mazzerle's house. Carbo had gone to Mazzerle's house so the two of them could go to the "tag place" and transfer title to the truck. He does not recall whether Biondi was there. Because Mazzerle was preparing for a graduation party, his partner William Moran accompanied Carbo to the "tag place" and filled out the paperwork for the transfer. Mazzerle does not recall exactly when Carbo took possession of the 1988 Mack truck.

After Mazzerle received Carbo's $10,000 bank check, he deposited it the next day in Pottstown Contracting's general account.  The same day as the deposit, Mazzerle and Biondi went to Opdike to purchase the 1995 Peterbilt.  Mazzerle wrote Opdike a check for $10,000 out of Pottstown Contracting's general account.  Biondi had money with him and also paid toward the purchase of the truck.  Carbo was not present.

Mazzerle considered he and Biondi to be co-owners of the 1995 Peterbilt truck, but he also considered the truck to be Biondi's.  Mazzerle and Biondi agreed that the truck was to be falsely titled and insured in the name of Pottstown Contracting. The title papers with the false information were prepared while Mazzerle and Biondi were at Opdike and Mazzerle understood they were to be mailed to Harrisburg.  Mazzerle later received the title papers in the mail from PennDot.

When the Peterbilt truck was purchased, Biondi felt it needed to be repainted because it was an ugly shade of brown. Biondi had the truck repainted a different color at Veccione's. Mazzerle does not know who paid for the paint job.

Mazzerle and Biondi had the same arrangement for the use of the 1995 Peterbilt truck as they had had for the 1988 Mack truck.  They also had the same arrangement for payment.  Biondi and Mazzerle could use the truck together or separately, and Mazzerle was to pay Biondi only in cash.

Mazzerle had a conversation with Biondi in 2002, about a year after their purchase of the 1988 Mack truck, about whether he was allowed to own the truck.  Biondi and Mazzerle were at an apartment house that Biondi owned and were discussing making renovations to the garage there so he could pull a truck into it. Biondi mentioned a "Borough rule or a charter or something" that "he is not allowed to have a second job" or make "extra money." Mazzerle asked how Biondi could own the apartment house if he was subject to this rule, and Biondi told him that the apartment house was titled in his wife's name.

Mazzerle had a conversation with Joseph Corropolese on October 30, 2003, in which the fact that Biondi had not disclosed his outside sources of income was discussed.  Carbo was not present for this conversation.

Mazzerle had another conversation with Biondi in November 2003, in which Biondi specifically discussed the requirement that he report his outside income.  This conversation occurred at a Hooter's Restaurant and those present were Biondi, Mazzerle, his partner William Moran, and Joseph Corropolese. Carbo was not present.  During the conversation, Biondi pointed out another man eating at the restaurant and said he was "some ethic [sic] guy on the state that does an audit or report on us every year," and that Biondi had just met with him that morning. Biondi mentioned that the man had asked questions about whether

30

Biondi had any "other income or other side jobs."  Mazzerle asked why the man was required to do that, and Biondi replied that "I am required to do it, the mayor is required to do it.  The chief of police is required to do it.  Just about everybody I guess."  During this conversation, Biondi appeared "kind of upset" and thought the man was following him.  At the time of this conversation, Mazzerle understood that Biondi had a reporting obligation to disclose outside income and that Biondi was not complying with it.

On April 29, 2004, Mazzerle was interviewed by IRS and FBI agents about his relationship with Biondi.  Mazzerle lied to the agents about concealing Biondi's ownership interest in the 1995 Peterbilt truck and about paying Biondi in cash.

During his testimony, Mazzerle was shown two checks from the account of Carbo's company, Tommy's Paving.  One for $2,000 is dated October 6, 2003, and made out to "Larry Mazerelli"; the other for $1,650 is dated March 3, 2003, and made out to "Larry Mazzirelli."  Both have endorsement signatures in Mazzerle's name, but Mazzerle says the signatures are not his.  The first check indicates it was cashed at Wachovia bank, but Mazzerle says he never cashed a check there.  The second indicates it was for "truck parts," but Mazzerle says he never sold truck parts to Tommy's Paving or received this check.

31

Mazzerle says never got cash or money from Carbo or did any work for him.

Mazzerle kept records of the profits and expenses generated by his use of both the 1988 Mack truck and the 1995 Peterbilt truck.  These records were kept in a secret ledger Mazzerle kept at Pottstown Contracting.  Except for Mazzerle and Biondi, no one else knew that such a secret ledger existed. According to Mazzerle, the secret ledger was necessary because he and Biondi had agreed that their business relationship would be secret and strictly a "cash deal."  Mazzerle omitted the profits and expenses recorded on the secret ledger from his company's official business records and from his tax returns, and never told his accountant about the secret ledger.  The ledger was discovered after search warrants were executed on Mazzerle's business.  Mazzerle also had a cash payroll and he paid employees, including Biondi, under the table to avoid paying withholding tax.


II.  <u>The Legal Standard for a Rule 29 Motion</u>

Under Rule 29 of the Federal Rules of Criminal Procedure, a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In deciding whether a jury verdict rests on legally sufficient evidence, a court must "view the evidence in the light

most favorable to the government, and will sustain the verdict if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>United States v. Smith</u>, 294 F.3d 473, 478 (3d Cir. 2002) (internal quotations and citations omitted).  In evaluating sufficiency, the court cannot weigh the evidence or determine the credibility of the witnesses.  <u>Id.</u>

III. <u>Elements of Honest Services Mail Fraud</u>

It is unlawful for any one "having devised or intending to devise any scheme or artifice to defraud" to use the mail in furtherance of the scheme.  18 U.S.C. § 1341.  The definition of a "scheme or artifice to defraud" includes a scheme to "deprive another of the intangible right of honest services."  18 U.S.C. § 1346.  To convict someone of violating § 1341, the government must prove beyond a reasonable doubt "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." <u>United States v. Antico</u>, 275 F.3d 245, 261 (3d Cir. 2001).

A scheme or artifice to defraud the public of honest services can include a public official's failing to make a legally required disclosure of a conflict of interest and then taking discretionary action in his or her official capacity that

33

he or she knows will directly benefit the concealed interest. United States v. Panarella, 277 F.3d 678, 680 (3d Cir. 2002). To establish honest services mail fraud, the government need not show that the official's conduct resulted in a tangible loss to the public, Antico at 263, or that the concealed financial interest improperly influenced the official's actions, Panarella at 680. The government, however, must show that the official failing to disclose a conflict of interest is under a legal requirement to do so. United States v. Murphy, 323 F.3d 102, 104 (3d Cir. 2003).

When an official fails to disclose a personal interest in a matter over which he or she has decision-making power, the public is deprived of its right to disinterested decision making and its right to full disclosure of the official's motivations, and is thereby deprived of its right to honest services. Antico, at 263. In the case of Mr. Carbo, a private citizen, the government alleged that he deprived the public of its right to Biondi's honest services as municipal administrator.

Carbo challenges the sufficiency of the government's proof on the second element of honest services mail fraud as set out in Antico: the defendant's specific intent to defraud. The government and the defendant agree on the government's burden of proof on this element: the government must show that Carbo knew that Biondi had a financial reporting requirement to the state

34

and that Carbo knowingly and intentionally assisted Biondi in his failure to comply with those reporting requirements.  <u>See</u> Defendant Thomas D. Carbo's Motion for Judgment of Acquittal at 2; Government's Response to the Defendant's Post-Trial Motions ("Gov't Br.") at 26 (citing <u>United States v. Holck</u>, 398 F. Supp.2d  338, 355 (E.D. Pa. 2005)).[3]

IV.   <u>Relevant Case Law on Specific Intent</u>

      The Court has examined the cases from the United States Court of Appeals for the Third Circuit dealing with honest services mail fraud and/or with the evidence necessary to support a conviction for a specific intent crime.  The Court first discusses the cases dealing with honest services mail fraud and then the cases involving other specific intent crimes.

      A.   <u>Honest Services Mail Fraud Cases in the Third Circuit</u>

           The United States Court of Appeals for the Third Circuit has addressed only briefly the sufficiency of proof necessary to show the specific intent necessary for honest services mail fraud.  Neither of the two Third Circuit cases

---

[3] The same degree of criminal intent is required to convict Carbo on the conspiracy charge as on the honest mail services fraud charge.  <u>See</u> <u>United States v. Feola</u>, 420 U.S. 671, 686 (1975) ("[I]n order to sustain a judgment of conviction on a charge of conspiracy to violate a federal statute, the Government must prove at least the degree of criminal intent necessary for the substantive offence itself.")

principally relied upon by the government, <u>Antico</u> and <u>Panarella</u>, provide much guidance to the Court because neither discuss the evidence necessary to show a defendant's knowledge of a reporting requirement.

     <u>Antico</u> involved a Philadelphia city official in the Licences and Inspections Department who set his girlfriend up in a private business as an "expediter" of applications to his department, in return for her not seeking child support.  Antico then directed business to his girlfriend and would approve applications submitted on behalf of her clients.  275 F.3d at 253-254.  Antico was charged and convicted, among other crimes, with honest services mail fraud.  On appeal, Antico's main challenge to the honest services conviction was that he should not have been convicted  1) because the existence of his girlfriend's business was an open secret in his office and so not concealed, and 2) because there was no evidence that the public was harmed by his actions.  <u>Id.</u> at 262.  The United States Court of Appeals for the Third Circuit held that Antico's failure to disclose his conflict of interest to his supervisors and his failure to recuse himself from decisions involving her clients constituted the requisite "deceit" necessary for mail fraud.  <u>Id.</u> at 264.

     The <u>Antico</u> court also briefly discussed the requisite intent necessary for conviction.  The Court stated that the fact

that Antico's relationship with his girlfriend was not a secret did not preclude a jury from finding the requisite intent to defraud.  The Court noted that Antico was specifically warned by his supervisor about having a conflict of interest and was told not to involve himself in approving his girlfriend's applications.  Despite this warning, Antico continued to do so, in one instance personally preparing an application for one of his girlfriend's clients and signing her name.  Id. at 265.  The court also found that the requisite intent was supported by the fact "that Antico never reported any conflict of interest to his superiors while at L & I, despite his knowledge of the state and local conflict of interest laws."  Id.  Because Antico's knowledge of the relevant conflict of interest laws was not in dispute, the case never addressed the sufficiency of evidence necessary to prove such knowledge.

Panarella is also of limited usefulness.  Unlike Antico, but like the case here, Panarella involved a private citizen accused of participating in a public official's failure to disclose a conflict of interest.  Panarella was accused of aiding and abetting a Pennsylvania state senator's scheme to deprive the public of the senator's honest services.  Panarella, who owned a tax collection business, hired the state senator as a consultant and the senator subsequently helped him obtain state contracts and spoke against legislation that would have harmed

37

Panarella's interests.  The state senator failed to report this
conflict of interest as required by law.  Panarella aided this
failure to disclose by concealing their relationship by having
third parties make payments on his behalf to the senator and by
encouraging one of these third parties to lie about the payments
to a reporter.  277 F.3d at 681.

Panarella pled guilty, but filed an appeal challenging
whether the facts alleged in the indictment established that the
senator had committed honest services mail fraud, and arguing
that because the alleged facts failed to show that the senator
committed honest services mail fraud, Panarella could not be
guilty as an accessory.  Id. at 681-82, 689.  Panarella's
principal argument was that because the indictment failed to
allege that the state senator misused his office for personal
gain, it did not properly allege honest services mail fraud.  The
Third Circuit rejected the argument, finding that personal gain
was "both under-inclusive and over-inclusive" as a means of
defining honest services mail fraud.  Id. at 692. Instead, the
court held that "a public official who conceals a financial
interest in violation of state criminal law while taking
discretionary action that the official knows will directly
benefit that interest commits honest services fraud."  Id. at
694.  Although refusing to hold that a violation of state law was
a necessary element of every honest services fraud indictment,

38

the court held that the fact that such a violation had been alleged in Panarella's case assuaged concerns over vagueness. Id. at 699.

Nowhere in the Panarella decision did the court discuss the element of specific intent, either with respect to the intent of the state senator to commit honest services fraud or the intent of Panarella to aid and abet that fraud.

The only cases in the Third Circuit that have been cited to the Court (or that the Court could find in its own research) that address the evidence necessary to prove the requisite specific intent for honest services mail fraud are two district court cases: United States v. Holck, 398 F. Supp.2d 338 (E.D. Pa. 2005), appeal pending, and United States v. Chartock, No. 05-cr-614-2 (E.D. Pa. March 1, 2007), appeal pending.

In Holck, two Commerce Bank officials challenged the sufficiency of the evidence supporting their conviction for honest services mail fraud for providing unusually favorable loans to the Philadelphia City Treasurer Cory Kemp.  The government had proceeded to trial on two alternate theories for the honest services mail fraud charges:  quid pro quo bribery; and non-disclosure of Kemp's conflict of interest.  The Holck court upheld the honest services conviction on the bribery theory, but agreed with the defendants that the government had failed to prove its conflict of interest theory because it had

39

not proved that the Commerce Bank officials knew of Kemp's duty to report the conflict.  Id. at 343-44, 355-56.  The Holck court rejected the government's argument that a jury could permissibly infer that the defendants knew of Kemp's reporting requirement either on the basis of the legal maxim that "ignorance of the law is no excuse" or by the fact that there had been no "publicity or inquiry regarding these loans," which, the government argued, allowed an inference that the loans had never been disclosed. Id. at 355.

In Chartock, the owner of a company accused of paying bribes to a Philadelphia City councilman challenged his conviction for honest services mail and wire fraud and money laundering.  As in Holck, the government had proceeded to trial under alternate theories of honest services fraud:  a bribery theory and a theory of non-disclosure of the councilman's conflict of interest.  The Chartock court upheld the defendant's conviction under both theories.  The court applied the same burden of proof on specific intent for the conflict of interest theory as did the Holck court:  "To convict a private citizen, such as Chartock, of honest services fraud under the conflict of interest theory, the government is required to show that Chartock was aware that [the councilman] was required to disclose their relationship and that Chartock knowingly assisted [the councilman] in the failure to disclose."  Id. at 10-11.  Unlike

40

Holck, however, the Chartock court found that the government had met this burden by showing (1) the disclosure requirement in the Pennsylvania Ethics Act, whose existence the court held was sufficient, in and of itself, to provide proof of a private citizen's knowledge of the reporting requirement; and (2) the defendant's efforts to conceal his payments to the councilman, which the court held allowed an inference that the defendant knew of the reporting requirement.  Id. at 1, 6, 10-12.

        B.    Other Decisions in This Circuit Involving
              Specific Intent Crimes

              1.    Drug Cases

                In a series of cases involving defendants convicted of various drug crimes, the United States Court of Appeals for the Third Circuit has emphasized that evidence sufficient to allow an inference that a defendant knows he is participating in something illegal does not satisfy the government's burden of proving that the defendant knew he was participating in the distribution of drugs.

                In United States v. Wexler, 838 F.2d 88 (3d Cir. 1988), the court reversed the conviction of a defendant for conspiracy and aiding and abetting the distribution of marijuana.  The court held that there was "ample circumstantial evidence" to show that defendant Wexler was involved in a conspiracy with his co-defendants to sell the contents of a truck, including the

41

defendant's driving his car in a manner suggestive of being a "look-out," his signaling one of the co-defendants, and his possessing surveillance equipment.  Id. at 91.  Despite this, the court found that there was insufficient evidence to show that the defendant knew that the truck contained a controlled substance because there was no evidence that he was ever told there were drugs in the truck, no evidence of his conversations with the other conspirators, and no evidence of a prior relationship with the drug trafficking co-conspirators.  Id.

The court rejected the government's argument that, because another member of the conspiracy had been carefully selected by the ringleader and had participated in other drug deals, there was a reasonable inference that this defendant had been similarly chosen and therefore knew of the drugs.  The court found that, even though there was sufficient evidence for an inference that the defendant "suspected, if not actually knew, that some form of contraband was involved in the elaborate secretive arrangements for transport in which he participated," that was not enough to show the defendant knew he was involved in a conspiracy to transport drugs, as opposed to some other contraband such as stolen goods.  Id. at 91-92.

In United States v. Salmon, 944 F.2d 1106 (3d Cir. 1991), the United States Court of Appeals for the Third Circuit considered, inter alia, three defendants involved in a drug sale

42

who were convicted of conspiracy to possess with intent to
distribute.  The court upheld the conviction of two of the
defendants but reversed the conviction of the third because the
evidence presented proved only that the third defendant had
helped to sell a wrapped package, but did not allow an inference
that the defendant knew the package contained cocaine.  Id. at
1113-14.  Although the government presented evidence that during
the drug deal the third defendant had opened the trunk of his
car, allowing the leader of the drug conspiracy to access it
before the drug exchange occurred, the court held that this did
not allow an inference that the third defendant knew cocaine was
the object of the transaction because there was no evidence that
cocaine was in the trunk at all, and even if it were, there was
no evidence that the third defendant knew it was there.  The
court noted that "there must be a logical and convincing
connection between the facts established and the conclusion
inferred."  Id. at 1114 (internal quotations and emphasis
omitted).

     In United States v. Thomas, 114 F.3d 403 (3d Cir.
1997), the court reversed a conviction for conspiracy to possess
cocaine with intent to distribute, finding that the government
had not proved that the defendant knew he was involved in a drug
transaction.  The government presented evidence that, as part of
a drug sting, a cooperating drug courier had been instructed by a

43

member of the conspiracy to leave a suitcase with cocaine in a
hotel room and leave the room key at the front desk in an
envelope under a particular name.  The defendant then appeared at
the front desk, asked for the envelope by name, went to the room,
and retrieved the drug suitcase, at which time he was arrested.
At trial, the defendant contended that he had been paid $500 to
pick up the suitcase by a man he did not know.  He testified that
he had not known what was in the suitcase and was not knowingly
part of a drug conspiracy.  Id. at 404-05.

Reversing the defendant's conviction, the Thomas court
found that while "[t]here can be no doubt that, when [the
defendant] pursued his errand . . . he knew that he was somehow
involved in an illicit activity" and had entered into "some kind
of agreement," the evidence did not show that he knew "the
purpose of the agreement was the specific unlawful purpose
charged in the indictment, i.e. the possession of a controlled
substance with intent to distribute."  Id. at 405.  The only
evidence the government presented to show the defendant's
knowledge was a record showing several phone calls between the
defendant's phone and the home phone of others in the conspiracy,
including several on the day of the pick-up.  This, the court
held, might not even be sufficient for an inference that the
defendant actually spoke to the co-defendant, and could not

support an inference about that the substance of those conversations concerned drugs.  Id. at 405-06.

In United States v. Idowu, 157 F.3d 265 (3d Cir. 1998), the United States Court of Appeals for the Third Circuit reversed a defendant's conviction for conspiracy to possess drugs with intent to distribute because the government had failed to prove specific intent.  The court noted that it had "consistently held in cases of this genre that, even in situations where the defendant knew he was engaged in illicit activity, and knew that 'some form of contraband' was involved in the scheme in which he was participating, the government is obliged to prove beyond a reasonable doubt that the defendant had knowledge of the particular illegal objective contemplated by the conspiracy." Id. at 266-67 (citations omitted).

The Idawu court found that, although the defendant had been involved in the drug transaction as the principal defendant's driver, had been present when the principal defendant and the supplier met and spoke about the transaction, and had opened the bag with the money for the transaction and showed it to the supplier, none of this was sufficient to show that the defendant knew that the transaction involved drugs, as opposed to other contraband.  Id. at 268-69.  Even taking all the evidence in the light most favorable to the government, the government had "failed to show that [defendant] Idawu knew what the deal was

about" because the facts of the case were "consistent with transactions that do not involve drugs of any sort."  Id. at 270.

### 2.  Cases Not Involving Drugs

Decisions in this circuit that reverse convictions for specific intent crimes because the government failed to prove a defendant's knowledge of the specific crime at issue are not limited to drug cases.

In United States v. Klein, 515 F.2d 751 (3d Cir. 1975), the United States Court of Appeals for the Third Circuit reversed the mail fraud conviction of an insurance adjuster found guilty of defrauding insurance companies of proceeds paid for fires started by arson.  The adjuster had been hired after the fires by the property owners to prepare proof of loss claims in return for a percentage of the settlement.  Id. at 752-53.  The court held that even though there was evidence supporting an inference that the adjuster suspected the fires could have been caused by arson, this did not show that he knew the owner was involved in the arson or joined in the scheme.  Id. at 754-55.

In United States v. Pearlstein, 576 F.2d 531 (3d Cir. 1978), the court reversed the mail fraud convictions of three salesmen accused of participating in fraudulent sales of pen distributorships.  The court found that the operation selling the pen distributorships was a fraudulent scheme because they

deliberately used false and misleading statements in their promotional material.  Id. at 536-37.  The court, however, found insufficient evidence to show that the defendant salesman knew that the business was fraudulent or that the promotional materials were false.  Although the government was able to show that the salesman made additional false or misleading representations in some of their individual sales presentations, there was no evidence linking these individual misrepresentations to the overall fraudulent scheme.  Id. at 540-44.  The court also found that mere evidence of friendship between the salesman and the company's owners did not support an inference that the salesmen knew of the fraudulent scheme.  Id. at 541.

        The United States Court of Appeals for the Third Circuit reaffirmed its holding in Pearlstein in United States v. Dobson, 419 F.3d 231 (3d Cir. 2005).  Like Pearlstein, Dobson involved a challenge to the mail fraud conviction of a salesperson for allegedly participating in a fraudulent scheme to sell distributorships.  Unlike Pearlstein, the Dobson defendant did not challenge the sufficiency of the evidence, but challenged the trial court's failure to instruct the jury that the government had to prove her "culpable participation" in the fraudulent scheme.  Id. at 233.  The trial judge had instructed that the jury had to determine "whether the defendant knowingly devised or participated in a scheme to defraud."  Id. at 237.

47

The Dobson court found this too vague because it could have
allowed the jury to convict because of the defendant's own
independent misrepresentations in her sales presentations,
without finding that she knew of the company's broader illicit
purpose.  The court reaffirmed its ruling in Perlstein that proof
of a defendant's knowing participation in the broader fraudulent
scheme charged in the indictment was necessary to support a
conviction.  Id. at 238-39.  The court accordingly ordered a new
trial.[4]

---

[4] The defendant cites a number of cases from other circuits
reversing mail fraud and drug convictions.  These cases are
essentially cumulative to the Third Circuit cases discussed
above.  See United States v. Rasheparian, 231 F.3d 1257 (10th
Cir. 2000) (reversing mail fraud and conspiracy convictions of a
father accused of laundering money for his sons' fraudulent
telemarketing business because the government failed to establish
that the father knew that his sons' business was fraudulent);
United States v. Fernandez, 892 F.2d 976, 986-89 (11th Cir. 1990)
(reversing conspiracy conviction of a hotel personnel director
accused of conspiring to help a company fraudulently obtain a
contract to service an employee benefit plan, because the
evidence showed two separate conspiracies, one involving the
defendant that did not involve illegal means to obtain the
contract, and another involving illegal means about which there
was no evidence the defendant had knowledge); United States v.
Bethea, 672 F.2d 407, 412 (5th Cir. 1982) (overturning RICO and
mail fraud convictions of officers of a moving company and the
Army official at Fort Benning responsible for arranging transport
of soldiers' personal goods, who were alleged to have overcharged
the army for un-requested storage services, finding that the
evidence "supporting the existence of a scheme to defraud is also
strongly consistent with innocent activity."); United States v.
Ballard, 663 U.S. 534 (5th Cir. Unit B Dec. 1981) (upholding the
conspiracy and honest services mail fraud convictions of a power
company official and purchasing agent who had participated in a
kickback scheme in which a "daisy chain" of suppliers marked up
the price of oil purchased by the power company by the maximum
regulatory allowed amount on the ground that the official and the

V.    The Sufficiency of Evidence in This Case

          The government contends that it has proven Carbo's
specific intent through two different means: 1) by the existence
of the reporting requirement of which the government contends
Carbo should be deemed to have presumptive knowledge sufficient
to establish specific intent; and 2) through circumstantial
evidence.


     A.    The Existence of the Ethics Act

          The government contends that the existence of the state
law requiring disclosure, the Pennsylvania Ethics Act, in and of
itself, supplies proof of Carbo's knowledge of Biondi's reporting
requirement.  The government bases this on Panarella, describing
the case as holding that "the existence of state law, on its own,
is sufficient to show a defendant's knowledge."  Gov't Br. at 27;
see also Gov't Br. at 38.

          The central issue in Panarella was whether an
indictment for honest services mail fraud for failure to disclose
a conflict of interest required the government to plead facts
showing that the official's failure to disclose resulted in

---

independent purchaser had fiduciary duties to disclose the
payments to the company, but reversing the convictions of other
participants in the "daisy chain," finding that there was
insufficient evidence to show that they knew that the oil
purchaser owed fiduciary duties to the power company or that the
official received kickbacks).

"personal gain."  277 F.3d at 692.  The court held that it did
not.  Instead, the Panarella court held that honest services mail
fraud required a showing that the official's lack of disclosure
violated state law and benefitted the concealed interest.  Id. at
695-96.  Nowhere in the opinion does the court discuss specific
intent or the sufficiency of evidence required to establish it.

        The government relies on a sentence of the opinion that
says that the state disclosure law that the Panarella defendants
were accused of violating provided them with "unambiguous notice"
that the official's "non-disclosure was criminal."  Panarella at
697 (cited in Gov't Br. at 38).  The government misconstrues this
sentence to mean that "no further proof of a private citizen's
knowledge is necessary" for conviction because "the existence of
state law, on its own, is sufficient to show a defendant's
knowledge."  Gov't Br. at 26-27; see also id. at 38-39.

        This reference in Panarella to the "notice" provided by
the state disclosure law has nothing to do with specific intent.
The reference occurs in an analysis of the Panarella defendants'
claim that the statutory definition of honest services mail fraud
is impermissibly vague and should be construed against the
government under the "rule of lenity."  Id. at 697-98.  The "rule
of lenity" requires that ambiguities in criminal statutes be
resolved against the government to ensure that defendants have
"fair warning of the boundaries of criminal conduct."  Id. at

50

697-98 (internal quotation and citation omitted).  The court held that the government's proposed construction of the law was not vague and that the rule of lenity did not apply because the non-disclosure at issue in Panarella involved the violation of a state criminal statute.  The "unambiguous notice" provided by the state statute therefore dispelled any concern that the defendants lacked warning that their conduct might be criminal.  Id. at 698.

Nothing in Panarella suggests that the "notice" provided by the existence of the state law relieves the government of its burden of proving every element of the crime charged, including the defendant's specific intent to commit honest services mail fraud, which the government concedes in this case requires proof that "Carbo was aware that Biondi was required to disclose their relationship and that Carbo knowingly assisted Biondi in the failure to disclose."  Gov't Br. at 26.[5]

_____

[5] At several places in its brief, the government also cites Panarella for the proposition that a defendant's attempt to conceal his relationship with a public official "undermines" any attempt to claim that the defendant was unaware of the official's reporting requirement. See Gov't Br. at 29, 33, 37, 38, 39.  This is another misinterpretation of Panarella.  Panarella's discussion of the effect of concealment, like its discussion of the notice provided by the Ethics Act, is part of its analysis of whether the application of the mail fraud statute to non-disclosure of a conflict of interest is impermissibly vague under the "rule of lenity."  Id. at 698.  It has nothing to do with specific intent.

Recognizing concerns that "federal fraud statutes give inadequate notice of criminality and delegate to the judiciary impermissibly broad authority to delineate the contours of criminal liability," the Panarella court held that such concerns were not implicated in the case before it, in part, because the

The government's contention that the presumption that everyone knows the law should relieve it of the burden of proving specific intent is not just unsupported by Panarella, it is also directly contradicted by repeated admonitions in the circuit courts against exactly that position.  As stated by the United States Court of Appeals for the Second Circuit:

> When we say that ignorance of the law is no excuse, or, as was said in this case, that everyone is presumed to know the law, we mean only the law that makes the offense punishable, not the law that in some circumstances sets out legal requirements that must be known in order to have committed the offense. The distinction is not the less vital because it is subtle. Moreover, when the law makes knowledge of some requirement an element of the offense, it is totally incorrect to say that ignorance of such law is no excuse or that everyone is presumed to know such law. Establishing an element of an offense concerning a requisite state of mind by a presumption relieves the prosecution of

---

defendant's attempts to hide his relationship with the official "undermine[d]" his claim that he had inadequate notice that his conduct could be criminal.  Id. at 698.  Panarella can therefore be read to suggest that evidence of concealment may allow an inference that a defendant suspects that his conduct may be illegal in the context of contradicting a claim of inadequate notice in a vagueness analysis.  The case does not, however, say anything about whether evidence of concealment can support an inference as to a defendant's specific intent.  Even if Panarella is read to support an inference that a defendant who conceals his actions may believe those actions to be illegal, such an inference would not establish the requisite intent.  As discussed more fully elsewhere in this Memorandum, and as courts in this circuit have repeatedly found, a suspicion that one's conduct may be illegal is insufficient, by itself, to prove specific intent.  See Idowu, 157 F.3d at 268-69; Thomas, 114 F.3d at 405; Salmon, 944 F.2d at 1113-14; Wexler, 838 F.2d at 91-92.

> its burden of proof, contrary to the
> requirements of due process.

United States v. Golitschek, 808 F.2d 195, 202-03 (2d Cir. 1986);
see also United States v. Rhone, 864 F.2d 832, 836-37 (D.C. Cir.
1989) (finding reversible error when trial judge instructed the
jury that ignorance of the law is no excuse in trial for mail
fraud requiring specific intent); United States v. Davis, 583
F.2d 190, 193-94 (5th Cir. 1978) (holding that trial courts may
not instruct the jury that every person knows what the law
forbids or that ignorance of the law is no excuse where the
defendant is charged with a crime requiring a showing of specific
intent); c.f. United States v. Zehrbach, 47 F.3d 1252, 1258-59,
1262-63 (3d Cir. 1995) (en banc) (holding that instruction that
"the government was not required to prove that the defendants
knew their actions to be illegal" was not reversible error, where
the crime charged required proof that a defendant's act be done
"knowingly,' i.e. that "the act be voluntary and intentional,"
but did not require proof that the defendant knew his actions
were in violation of the law).


   B.   The Circumstantial Evidence

        The government admits that it has no direct evidence
that Carbo knew that Biondi was required to report Carbo's
payments to the state.  No witness testified at trial that Carbo
knew of the reporting requirement and no reference to a reporting

requirement is made on the recording the government made of
Carbo's conversation with a cooperating witness.  Direct
evidence, however, is not necessary to convict someone of honest
services mail fraud.  Its elements, including the element of
specific intent, can be proved entirely with circumstantial
evidence.  Pearlstein, 576 F.2d at 541 ("In the absence of direct
evidence, however, the requisite knowledge and intent [for mail
fraud] can be demonstrated circumstantially and, where sufficient
circumstantial evidence is presented, a jury may properly infer
that the defendants were culpably involved with, and knowingly
furthered, the fraudulent scheme.") (internal citation omitted);
see also United States v. Brodie, 403 F.3d 123, 134 (3d Cir.
2005).

          The government relies on essentially three pieces of
circumstantial evidence, which it contends allowed the jury to
infer that Carbo knew of Biondi's reporting requirement:
1) Mazzerle's testimony that Biondi told him about his reporting
requirements, which the government contends allows an inference
that Biondi similarly told Carbo; 2) Carbo's efforts to conceal
his relationship with Biondi, which the government contends
allows an inference that Carbo was doing so as part of a
conspiracy to evade the reporting requirement; and 3) Carbo's
reference in the recorded conversation between him and
Corropolese to a "paper trail to hell" and "auditors," which the

government contends allows an inference that Carbo was knowingly helping Biondi evade his reporting requirement and feared being exposed.  Although, in evaluating the sufficiency of the government's circumstantial case, the Court must not view the evidence in isolation, but rather must evaluate it "in conjunction and as a whole," <u>Brodie</u> at 134, the Court will address each piece of circumstantial evidence separately before considering whether, taken together, they are sufficient to support the jury's verdict.

### 1   <u>Mazzerle's knowledge of the reporting requirement</u>

Mazzerle testified that he had a conversation with Biondi on November 20, 2003, about Biondi's duty to report outside income to the state.  The conversation occurred at a Hooter's Restaurant during a lunch with Mazzerle, his partner William Moran, Biondi and Joseph Corropolese.  Mazzerle testified that the subject came up because a state ethics officer was also eating at the same restaurant:

> He [Biondi] said to my partner and I, he said, I just met with a guy from the state this morning, he had to do an interview with me and here he is at Hooter's.  I said, what's the big deal and he said well it is some ethic [<u>sic</u>] guy from the state that does an audit on us or a report on us every year. And I said, well what's the problem?  He said, I, he is asking questions about do you have any other income or any other side jobs. Well I said, why is he required to do that? He said, well I'm required to do it, the

> mayor is required to do it.  The chief of
> police is required to do it.  Just about
> everybody I guess.

Mazzerle Testimony, 6/7/2006 Tr. at 249.

The government's brief characterizes this testimony as Biondi "telling Mazzerle and others that he and other Norristown public officials . . . were required to fill out forms disclosing [ ] their income and financial relationships."  Gov't Br. at 33. The government further characterizes this conversation as Biondi's "instruction" to Mazzerle as to why their relationship needed to be concealed.  The government argues that a jury could reasonably infer that "Biondi gave the same instruction to all members of the conspiracy – including Carbo – and not just Mazzerle" because "Biondi would not go to all the trouble of detailing his reporting requirements to Mazzerle . . . [and] not tell Carbo as well."  Gov't Br. at 33-34.

The government's characterization overstates reasonable inferences that can be drawn from this testimony. Mazzerle's testimony concerning the circumstances of his conversation with Biondi undercuts the inferences that the government seeks to make.

Mazzerle's testimony about the November 2003 conversation indicates that he did not know about Biondi's reporting requirement prior to that conversation.  Mazzerle testified that when Biondi mentioned that an auditor was looking

56

into his financial arrangements, Mazzerle asked "why is [the auditor] required to do that," which prompted Biondi to tell him about the reporting requirement.  This strongly suggests that Mazzerle did not know of the reporting requirement before November 2003 and, considered with the other facts surrounding the conversation, renders unreasonable the government's inference that Biondi was "instructing" Mazzerle about the reporting requirement in this conversation.[6]

---

[6]  On cross-examination, Mazzerle testified about an October 30, 2003, conversation that he participated in with Mr. Corropolese.  This conversation was recorded by the government, but the recording was not introduced into evidence.  The questioning on this conversation was limited and confusing, but Mazzerle's response could be interpreted to suggest that Mazzerle first learned of Biondi's reporting requirement in the October 30, 2003, conversation, not the November 20, 2003, conversation at Hooter's.  The relevant testimony was:

> Q    Again, this October 30th, 2003,
>      discussion that you had, you learned
>      during that conversation that Mr. - that
>      Mr. Biondi had a reporting, that he
>      couldn't disclose the sources of his -
>      I'm sorry - that he hadn't disclosed the
>      sources of his outside income, true?
> A.   True.

Mazzerle Testimony, 6/8/06 Tr. at 65.  Even if this exchange is interpreted as establishing that Mazzerle learned of the reporting requirement on October 30, 2003, rather than 20 days later in the conversation at Hooter's, it does not change the Court's analysis.  Whether Mazzerle first learned of Biondi's reporting requirement in October 2003 or November 2003, that fact undercuts the government's characterization that Biondi was "instructing" Mazzerle.

Mazzerle testified that the subject of Biondi's ethical reporting obligations came up because Mazzerle and Biondi were eating at the same restaurant as the state ethics officer on the day of the officer's annual interview with Biondi.  There is no suggestion in the testimony that Biondi had planned to discuss his reporting requirement with Mazzerle or that the subject would have come up absent the chance encounter with the ethics officer.

In addition, the November 2003 conversation took place over a year and a half after Biondi and Mazzerle had gone into business together and begun concealing their relationship. Mazzerle testified that when he and Biondi first agreed to purchase the 1988 Mack truck together in 2001, Biondi gave him several "instructions" about their relationship:  Mazzerle was to pay Biondi only in cash and Mazzerle was not to use the truck in the Borough.  There was no testimony, however, that any of Biondi's "instructions" at the beginning of their business relationship mentioned his reporting requirement.

Taken together, these facts render unreasonable the government's proposed inference that the November 2003 conversation was Biondi "instructing" Mazzerle about his reporting requirement and the need for secrecy in their dealings and that Carbo was necessarily similarly instructed.

Putting aside the government's unwarranted description of the November 2003 conversation as an "instruction," Mazzerle's

testimony does establish that Biondi told Mazzerle in that conversation that he had a duty to disclose information about his sources of income to the state.  The government contends that the fact that Biondi told Mazzerle about his reporting requirement allows an inference that Biondi told the same thing to Carbo. Gov't Br. at 35.

In support of this inference, the government points to the friendship between Carbo and Biondi, evinced by the fact that Carbo repeatedly referred to Biondi as his "friend" in his recorded conversation with Corropolese.  The government argues that this supports an inference that Carbo had as close a relationship to Biondi as Biondi had with Mazzerle, which in turn supports the further inference that Biondi told Carbo the same things he told Mazzerle.  The government also points to similarities between Biondi's relationship with Mazzerle and his relationship to Carbo, including the fact that both Carbo and Mazzerle took actions to hide their relationship to Biondi and that both paid Biondi in cash for the use of his trucks at the same time that Biondi was awarding them work.  The government contends that these similarities between Mazzerle and Carbo's relationship support an inference that both knew about Biondi's reporting requirement.

These facts are not sufficient to allow a reasonable jury to infer that, because Biondi told Mazzerle about his

reporting obligations, he similarly told Carbo about them.  In general, evidence that one member of a scheme has been told information about the scheme's ultimate illicit purpose does not support an inference that another member has been similarly trusted.  See Wexler, 838 F,2d at 91-92 (holding that the fact that a leader of a drug conspiracy hired one participant knowing of his prior involvement in drug sales, did not justify an inference that the leader "exercised the same care" in hiring the defendant, and therefore could not support the inference that the defendant knew that the transaction involved drugs).  Similarly, the fact that a defendant has a personal friendship with a participant in a fraudulent scheme does not support an inference that the defendant knows of the scheme or of its fraudulent purpose.  See Pearlstein, 576 F.2d at 541.

    An inference might be justified in some situations; for example, where there is evidence of a pattern of every participant in a scheme being told of its ultimate purpose when they first join.  In such a case, depending on the strength of the particular facts, a rational jury might, without a reasonable doubt, infer that all members of the scheme were similarly instructed.  Here, as discussed above, there is no evidence of such a pattern of "instruction," or any other basis for an inference that Biondi told Carbo about the reporting requirement.

### 2    Carbo's concealment of his relationship with Biondi

The government suggests that Carbo's efforts to conceal both his relationship with Biondi and his payments to him allow an inference that Carbo knew his payments to Biondi were to be kept secret and knew that the reason for this secrecy was to evade Biondi's reporting requirements.  Gov't Br. at 28-33, 39-41.  The acts of concealment that the government relies on for this inference include:

- Carbo's paying Biondi in cash for use of his truck and his recorded statement to Corropolese that he "had to" do so;

- Carbo's lack of records regarding his cash payments to Biondi or his 2003 purchase of the 1988 Mack truck;

- Carbo's methods of paying for the 1988 Mack truck, which the government contends were used to disguise the fact that the payments went to Biondi;

- The government's contention that Carbo was instructed by Biondi not to use his trucks in the Borough and Carbo's alleged compliance with this instruction; and

- Carbo's knowledge that the 1995 Peterbilt truck owned by Mazzerle and Biondi had been falsely titled in Mazzerle's company's name.

Gov't Br. at 29-31.  The government contends these acts of concealment, taken together, are "powerful evidence that a

defendant is aware that his conduct is wrong and illegal."  Gov't Br. at 41.

a.  <u>Cash payments</u>

The government introduced sufficient evidence at trial for a jury to find that Carbo paid Biondi exclusively in cash and that this was done at Biondi's request.  Evidence was presented that Carbo often paid vendors and contractors in cash; that Biondi did work for Carbo; and that Carbo had no records of any payments to Biondi by check or other non-cash means.  In addition, Mazzerle testified that, at Biondi's request, all his dealings with Biondi had to be conducted in cash, and Mr. Carbo stated in the Corropolese recording that he too had to pay Biondi in cash:

> [I owe Biondi] five grand for work he did about a month ago . . . [b]ut the people that I was working for were slow pay.  So <u>if I could write him a check, I'd write him a fuckin' check, but I got to get cash."</u>

Excerpts of Transcript of November 20, 2003, conversation between Carbo and Joseph V. Corropolese, gov't Exh. 110 at 8 (emphasis added).

b.   <u>Lack of records</u>

The government presented sufficient evidence for a jury to find that Carbo failed to keep records of payments to Biondi and that this failure was intentional.  Special Agent Capra testified that her review of the Quickbooks and other financial records of Carbo's business showed no records of any payments to Biondi, despite the evidence discussed above that Carbo made numerous cash payments to him.  Viewing the facts in the light most favorable to the government, the jury was entitled to find that Carbo intentionally failed to keep records of his payments to Biondi.[7]

c.   <u>Disguised payments to Biondi</u>

A jury could reasonably infer from the evidence presented that Carbo concealed his payments to Biondi for his purchase of the 1988 Mack truck.  The government introduced evidence that Carbo purchased Biondi and Mazzerle's 1988 Mack truck for $20,000, paid in part with a bank check for $10,000.  The government also presented evidence that, on the same day that

---

[7] In his motion for acquittal, the defendant argues that he did not attempt to conceal his relationship with Biondi and offers explanations for his cash payments and his lack of records.  These explanations are immaterial to this motion and cannot be considered by the Court.  Whatever the strength of Carbo's explanations, they were rejected by the jury.  The Court is not permitted to re-weigh the evidence presented at trial or substitute its judgment for that of the jury.

Carbo obtained the check, July 9, 2003, he made a cash withdrawal for the same amount, which was described in his company's Quickbooks as being for "job materials".  Special Agent Capra testified that, in her opinion, the cash withdrawal was really made to pay for the check for the 1988 Mack truck.  On this evidence, a reasonable jury could conclude that Carbo's cash withdrawal was used to pay for the truck and that the Quickbook description of the withdrawal as for "job materials" was an attempt to disguise the payment.

This inference is also supported by the evidence that Carbo made a $4,500 cash withdrawal on July 9, 2003, the same day he bought the $10,000 bank check to pay Mazzerle.  Coupled with Mazzerle's testimony that Biondi said that Carbo paid him part of the purchase price of the truck (but was still short $5,000), a jury could infer that Carbo used the $4,500 cash withdrawal to pay Biondi part of the price of the 1988 Mack truck.  Such a payment was not reflected in Carbo's business records, which Agent Capra testified, contain no record of any payment to Biondi.

Similarly, a jury could find from Mazzerle's testimony that Biondi had the 1995 Peterbilt truck painted at Veccione's shortly after they purchased it, combined with evidence of Carbo's August 28, 2003, purchase of a bank check for $2,412.56 made out to "Vecchione" [sic], which was not recorded in his

64

business records, that Carbo partially paid for the 1988 Mack truck by having Biondi's new truck painted and did not record the payment.  A reasonable jury could interpret all these actions as further attempts by Carbo to conceal his payment to Biondi for the truck.

        d    Biondi's instruction not to use the trucks in the Borough

      The government contends that the evidence introduced at trial allows the inference that Biondi "instructed Carbo and Mazzerle not to use the truck in the Borough because was concerned that certain Borough public works employees who knew he owned the truck would be upset that he was personally profiting from Borough jobs."  Gov't Br. at 32.  There is no evidence in the trial record, however, that Biondi ever gave Carbo this instruction.  Mazzerle testified that Biondi instructed <u>him</u> not to use their truck for jobs in the Borough to avoid being accused of profiting on Borough work.  No evidence was presented, however, that Biondi ever similarly instructed Carbo.

      The government argues that a jury could infer that "Carbo got this precise instruction from Biondi because neither Carbo nor Mazzerle ever used the truck in the Borough."  <u>Id.</u>  The Court has serious doubts as to whether this is a reasonable inference from the facts in evidence.  For the purposes of this motion, however, to give the government the benefit of every

65

doubt, the Court will assume that the evidence presented was sufficient to support the inference that Biondi instructed Carbo not to use the trucks in the Borough and that Carbo complied.

> **e**    Carbo's knowledge of Biondi's false titling
> of the 1995 Peterbilt truck

The government presented sufficient evidence for a jury to find that Carbo knew that the 1995 Peterbilt truck owned by Biondi and Mazzerle had been falsely titled in the name of Pottstown Contracting.  In the Corropolese recording, Carbo says that he told Biondi that Biondi would have trouble taking possession of the truck after he was no longer municipal administrator because it was in the names of Mazzerle (referred to as "Larry") and his partner William Moran ("Billy"):

| | |
|---|---|
| Carbo: | I told Anthony, you better get that truck out of Billy and Larry's name before you, mother fuckin', before that borough's done. |
| Corropolese | Yeah. |
| Carbo: | I said because you'll never, he goes I'll kill him.  I said you'll have to kill him to get it. |
| Corropolese | You're going to have to kill him.  You know why, believe me, when he ain't the borough manager.  You could forget them. |
| Carbo: | He knows that.  He tells me that. |

Gov't Exh. 110 at 31.  This recording constitutes direct evidence that Carbo knew that Biondi had an ownership interest in the 1995

Peterbilt truck and that the truck was inaccurately titled only in the names of Mazzerle and his partner.

### f   Inferring specific intent from these acts of concealment

Considered together and viewed in the light most favorable to the government, a reasonable jury could conclude from the evidence presented that Carbo attempted to conceal both his payments to Biondi and his on-going business relationship with him. The government argues that a reasonable jury could make a further inference and conclude from these acts of concealment that Carbo knew that the reason for keeping the relationship secret was to evade Biondi's duty to report his relationship to the state. This last and crucial inference, however, is not reasonable from these facts.

The government is correct that attempts at concealment may give rise to a reasonable inference that a defendant knew or suspected that what he was concealing was illegal. See Brodie 403 F.3d at 155-56; c.f. Panarella at 698. Merely suspecting that one might be involved in illegality, however, is not sufficient to establish specific intent. See Idowu, 157 F.3d at 268-69; Thomas, 114 F.3d at 405; Salmon, 944 F.2d at 1113-14; Wexler, 838 F.2d at 91-92. Carbo's attempts at concealment may demonstrate that he believed his relationship with Biondi or his payments to him were illegal, but that is not the fraudulent

scheme with which he has been charged.  Having been charged with honest services mail fraud in the form of participating in a scheme to evade Biondi's reporting requirements, Carbo must be shown, not just to have known that his relationship or payments to Biondi were illegal, but to have known that Biondi had a duty to report that relationship and those payments.  This particular knowledge cannot be inferred just from Carbo's attempts to conceal that relationship.

> ### 3   Carbo's references to auditors and a "paper trail to hell"

The government suggests Carbo's specific intent can be inferred from a reference to "auditors" and a "paper trial to hell" in his recorded conversation with Corropolese.  In the relevant portion of the recorded conversation, Carbo discusses the relationship between Biondi, Mazzerle ("Larry") and Mazzerle's partner William Moran ("Billy"):

| | |
|---|---|
| Carbo: | Dude, (unintelligible), don't start shit, dude, I'm tired.  I'll be honest with you, I, some of the times I don't go to lunch, because Billy and Larry are always, Billy, let me tell you what Larry did to me. |
| Corropolese: | You know, Billy and Larry taking care, why does Anthony [Biondi] hang with them, are they, are they. |
| Carbo: | I don't know. |

Coropolese:      Maybe they're taking care of him and
                 nobody knows it. because, I said, yo,
                 Ant, you know, I mean I don't, you know,
                 him and I are friends, but.

Carbo:           Well, me and him are friends.  He
                 wouldn't take, he won't let me, if I do
                 a job, he won't even let me buy him
                 dinner.

Coropolese:      Yeah.

Carbo:           Like, come on man, let me say thanks.  I
                 would do that to anybody.

                 * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

Carbo:           But I told him, you know.  I like him
                 for him.  I don't care.  Or else, if I
                 was that way, I would have been mad.  I
                 was over there doin' alleys up and down,
                 them fucking alleys, for eight hundred
                 dollars, a thousand dollars, and I was
                 all over there by myself quiet, no one
                 knew what was going on, the whole nine
                 yards, and Billy and Larry get involved.
                 Now they're out in the fucking street
                 with Reed involved, fuckin' Delaney down
                 there with the county shit.[8]  Let me
                 tell you right now, <u>there's a fucking
                 paper trail to hell for that shit</u>.

Corropolese      Yeah.

Carbo:           Now they all you know, <u>everyone says
                 auditor came, you know, guess what,
                 something ain't right.</u>  I love him to
                 death, and, all I know is he never took
                 anything from me and always insisted he
                 didn't want anything.

Gov't Exh. 110 at 18-19 (emphasis added).

_____

     [8] Corropolese testified that the "Reed" referred to by Carbo
was a paver contractor and that "Delaney" was a "foreman for the
county road and bridges."  Corropolese Testimony, 6/7/06 Tr. at
141.

The government interprets Carbo's references to "auditors" and a "fucking paper trail to hell" as Carbo saying that auditors might find documents that disclosed the relationship between Biondi and Mazzerle which could cause Biondi and Mazzerle to get in trouble.  The government argues that, so interpreted, these references permit an inference that Carbo was aware that Biondi was required to disclose his relationships with Carbo and Mazzerle and that Carbo, Mazzerle, and Biondi had conspired to prevent such disclosure.  Gov't Br. at 36-38.

Interpreting what Carbo meant by a "paper trail to hell" is difficult.  Mr. Corropolese, to whom the comment was made, testified that he did not know what Carbo meant by the phrase.  Corropolese Testimony, 6/7/06 Tr. at 141.  Viewing this conversation in the light most favorable to the government, however, with the benefit of all reasonable inferences, a jury could find that Carbo's comments refer to Mazzerle's business relationship with Biondi and Biondi's need to keep the relationship secret to avoid trouble with auditors.

Even with this interpretation, however, the comments cannot support an inference that Carbo knew of Biondi's reporting requirements.  Carbo's reference to auditors finding a "paper trail to hell" concerning Mazzerle's relationship with Biondi supports an inference that Carbo knew or suspected that their relationship was illegal or otherwise prohibited.  This in turn

70

could support a reasonable inference that Carbo knew or suspected that his similar relationship with Biondi was also illegal or prohibited.  It does not, however, support a yet further inference that Carbo knew Biondi had any reporting requirement to the state or that Biondi's attempt to hide his relationship with Carbo was intended to evade that requirement.  As discussed above, evidence that shows only that a defendant suspects his conduct may be illegal is not sufficient to establish the defendant's specific intent to knowingly and willfully commit the particular crime alleged.  See, e.g., Idowu, 157 F.3d at 268-69; Wexler, 838 F.2d at 91-92.

### 4   The sufficiency of all the circumstantial evidence, considered together

In determining the sufficiency of the circumstantial evidence concerning Mr. Carbo's specific intent, the Court is required to evaluate the evidence "in conjunction and as a whole" and not merely view each piece in isolation.  Brodie, 403 F.3d at 134.  Even taken together and viewed in the light most favorable to the government, the circumstantial evidence presented by the government is not enough to satisfy its burden as to specific intent.  Whether considered separately or together, the evidence presented is insufficient to allow a rational jury to find beyond a reasonable doubt that Mr. Carbo knew that Mr. Biondi was

required to disclose their relationship to the state and that Mr. Carbo knowingly assisted in the failure to disclose.

VI.   Carbo's Motion for a New Trial

        Although the Court is granting Carbo's motion for acquittal for the reasons above, it must still address the merits of Carbo's motion for a new trial.  Under Fed. R. Crim. P. 29(d)(1), if the Court enters a judgment of acquittal after a guilty verdict, the Court must conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.  The Court here conditionally determines that the motion for a new trial should be denied.

        Rule 33 permits a court to grant a new trial "if the interest of justice so requires."  Determining whether to grant a new trial is committed to a trial court's discretion, but when considering whether a verdict is contrary to the weight of the evidence, the court should grant a new trial only if it believes "there is serious danger that a miscarriage of justice occurred." United States v. Johnson, 302 F.3d 139, 150 (3d Cir. 2002) (internal quotation omitted).  In evaluating a Rule 33 motion, the court does not view the evidence in the light most favorable to the government, but instead "exercises its own judgment in assessing" the government's case.  Id.

72

Carbo's first argument is that the verdict is against the weight of the evidence.  The Court has already determined that there is insufficient evidence on the question of the defendant's specific intent.  If the United States Court of Appeals for the Third Circuit disagrees with that decision, the Court would not grant a new trial on the ground that the verdict is against the weight of the evidence.

Carbo also argues that certain of the Court's evidentiary rulings were improper.  The Court also finds no merit to this argument.  Mazzerle's testimony concerning Biondi's statements during the time of the alleged conspiracy were admissible as non-hearsay under Fed. R. Evid. 801(d)(2)(e).  The Court also properly limited the evidence that the Government could introduce relating to Carbo's access to cash.  The Court relies on its pretrial ruling with respect to the admission of the November 20, 2003, conversation between Carbo and Corropolese.  Finally, the Court finds there was no prosecutorial misconduct in this trial.

VII. Motion For Arrest of Judgment

Carbo has also moved for an arrest of judgment pursuant to Fed. R. Crim. P. 34(a).  That rule provides that a court "must arrest judgment if:  (1) the indictment or information does not

charge an offense; or (2) the court does not have jurisdiction of the charged offense."  Carbo argues both grounds are met here.

Carbo incorporates by reference the arguments he previously made in his motion to dismiss the Superceding Indictment.  He also argues that the government has failed to "show that the mailings cited as the basis for criminal liability were reasonably foreseeable to Mr. Carbo as well as 'incident to an essential part of the scheme'" and that this "impacts the Court's jurisdiction."  Carbo Br. in support of Motion to Arrest Judgment at 5 (citation omitted).

The Court already denied prior to trial Carbo's motion to dismiss the Superceding Indictment.  The Court relies on that decision in denying the motion for arrest of judgment.  Carbo's additional argument challenging the connection between the mailings and the fraudulent scheme does not change the Court's prior conclusion.  That argument is essentially a challenge to the sufficiency of the government's evidence and does not raise a jurisdictional issue.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA        :       CRIMINAL ACTION
                                :
            v.                  :
                                :
THOMAS D. CARBO                 :       NO. 05-418-3

ORDER

        AND NOW, this 10th day of August, 2007, upon
consideration of defendant Thomas Carbo's Motion for Judgment of
Acquittal Pursuant to Rule 29 (Docket No. 147), his Motion for
New Trial Pursuant to Rule 33 (Docket No. 148), and his Motion to
Arrest Judgment Pursuant to Rule 34 (Docket No. 149); the
government's opposition to those motions; and the defendant's
response thereto, IT IS HEREBY ORDERED that, for the reasons set
forth in the accompanying Memorandum, the defendant's Motion for
Judgment of Acquittal is GRANTED and the defendant's Motion for a
New Trial and Motion to Arrest Judgment are DENIED.


                        BY THE COURT:


                        /s/ Mary A. McLaughlin
                        MARY A. McLAUGHLIN, J.